IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANTHONY HUGHLEY, #190065, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. JKB-19-1950 |
| MATTHEW CARPENTER, P.A., HOLLY PIERCE, N.P., ASRESAHEGN GETACHEW, M.D., and WEXFORD HEALTH SOURCES, INC., | * * | |
| Defendants. | * | |

\*\*\*

## MEMORANDUM OPINION

Self-represented Plaintiff Anthony Hughley, an inmate at Jessup Correctional Institution in Jessup, Maryland ("JCI"), filed the above-captioned 42 U.S.C. § 1983 civil rights action against Matthew Carpenter, P.A., Holly Pierce, N.P., Asresahegn Getachew, M.D.,[1] and Wexford Health Sources, Inc. ("Wexford"). Plaintiff alleges that Defendants failed to provide the appropriate treatment regarding his colostomy and resulting keloids. ECF No. 1. He seeks punitive and compensatory damages, as well as injunctive relief. *Id.* at 6.

On October 24, 2019, Plaintiff filed a Motion to Amend (ECF No. 19) seeking to name additional defendants, and on October 31, 2019, he filed a Motion for Immediate Injunction (ECF No. 21) requesting a colostomy reversal and keloid removal. Defendants opposed both motions. ECF Nos. 20, 22. On November 12, 2019, Defendants filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. ECF No. 25. Plaintiff filed a response in opposition, to which Defendants replied. ECF Nos. 29, 30.

This Court deems a hearing unnecessary. *See* Local Rule 105.6 (D.Md. 2018). For the

---

[1] The Clerk shall amend the docket to reflect the full and correct names of Defendants Carpenter, Pierce, and Getachew.

reasons set forth below, Defendants' Motion, construed as a motion for summary judgment, shall be granted. Plaintiff's motions shall be denied.

## Background

Plaintiff states that on June 30, 2016, while incarcerated at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, he underwent a surgical procedure to have a colostomy bag placed on his lower left abdomen, resulting in 37 staples near his mid-section. Compl., ECF No. 1 at 2; Request for Admin. Remedy, ECF No. 1-1 at 1. Plaintiff claims that the surgeon ordered him to return for a follow-up, during which time the staples would be removed. ECF No. 1-1 at 2. However, on July 19, 2016, Defendant Carpenter improperly removed the staples with "shaking hands [and] no gloves," causing a keloid[2] to develop down the center of Plaintiff's abdomen. ECF No. 1 at 2.

According to Plaintiff, the surgeon "promised" him that the colostomy procedure would be reversed within four months. *Id.* Plaintiff claims that in November 2017, while he was awaiting the reversal and suffering from pain caused by the keloid, Defendant Pierce discontinued his pain medication and neglected to follow-up on Plaintiff's off-site medical appointments. *Id.* at 3. Plaintiff avers that both Wexford and the medical director, Dr. Getachew, condoned Pierce's actions, leading to the delay in performing the colostomy reversal procedure. *Id.*; ECF No. 1-1 at 3-4.

In support of their motions, Defendants have submitted copies of Plaintiff's medical records and a sworn affidavit from Dr. Getachew. Medical Records, ECF No. 25-4; Aff. of Getachew, ECF No. 25-5. The records reflect that Plaintiff is a 53-year-old male inmate with a

---

[2] A keloid is a type of raised scar that is usually caused by a skin injury. *See* American Academy of Dermatology Association, https://www.aad.org/public/diseases/a-z/keloids-overview (last visited September 21, 2020). Sometimes, a surgical scar becomes a keloid. *Id.*

medical history significant for abdominal pain, tinea pedis, chronic constipation, Hepatitis C Virus, megacolon, dermatophytosis, and hyperlipidemia, as well as a mental health history of depression. *See id.*

On June 30, 2016, Plaintiff had a left hemicolectomy, including splenic flexure, and colostomy performed by Ashok K. Agrawal, M.D., at Bon Secours Hospital ("BSH"). ECF No. 25-4 at 2-4. Plaintiff tolerated the surgery well, and there were no complications. *Id.* at 3. When he was discharged on July 11, 2016, Plaintiff was instructed to keep the incision site clean and dry, resume a normal diet, follow up with Dr. Agrawal in one week, and take Zofran as needed for nausea or vomiting. *Id.* at 2.

Upon discharge, Plaintiff was transported to the JCI infirmary, where he was prescribed Zofran, Percocet for pain, and the laxative Dulcolax. *Id.* at 5. On July 12 and July 14, 2016, Plaintiff was seen by Hiruy Bishaw, M.D., who noted that the colostomy bag and staples were in place, and the surgical wound was clean and appeared to be healing. *Id.* at 7-10. On July 15, 2016, Dr. Bishaw discharged Plaintiff to the infirmary at Western Correctional Institution ("WCI") in Cumberland, Maryland. *Id.* at 11-12. Plaintiff denied shortness of breath, had no abdominal pain, and was passing feces through the colostomy bag. *Id.*

On July 19, 2016, just prior to being transported to WCI, Plaintiff was seen by Defendant Carpenter at the JCI infirmary. *Id.* at 13-14. Carpenter offered to remove the staples and Plaintiff initially refused, claiming that "the surgeon wanted to remove the staples himself." *Id.* Carpenter noted that the hospital discharge documents did not indicate that the surgeon should remove the staples. *Id.* Thereafter, Plaintiff consented to removal of the staples and they were removed without incident. *Id.* Carpenter noted that the linear incision was well-healed and there were no signs of infection. *Id.*

3

On July 21, 2016, Plaintiff was seen by Robustiano Barrera, M.D. at the WCI infirmary. *Id.* at 15-16. Plaintiff was noted to be doing well despite having surgical site pain. *Id.* Because Tylenol #3 was not helping, Dr. Barrera prescribed Tramadol for pain. *Id.* The following day, Plaintiff was seen by Ali Yahya, M.D. *Id.* at 17. On examination, Plaintiff looked well and was in no distress. *Id.*

On July 26, 2016, Plaintiff was seen by Krista Bilak, N.P. at chronic care clinic. *Id.* at 18-20. Plaintiff continued to have abdominal pain, which was worse along the incision line, and was positive for keloid scarring. *Id.* Feed-in for 30 days was ordered. *Id.*

On August 11, 2016, Plaintiff was seen by Dr. Agrawal for follow up. *Id.* at 21-23. Plaintiff reported that the pain was improving, and he was having regular bowel movements without laxatives. *Id.* Dr. Agrawal noted that the colostomy bag fit and functioned well. *Id.*

On September 8, 2016, Plaintiff was seen by NP Bilak during a scheduled visit. *Id.* at 24-25. Plaintiff was educated that the staples and wound retainer in his abdomen were intact and not a surgical error. *Id.* Plaintiff continued to complain of pain at the incision, and he was educated on pain associated with keloids. *Id.* NP Bilak noted that Plaintiff he had been scheduled for a follow-up with Dr. Agrawal. *Id.*

On September 14, 2016, Plaintiff had another scheduled visit with NP Bilak. *Id.* at 26-27. Plaintiff asked when he would have the follow-up with Dr. Agrawal and inquired about the time frame for colostomy because he believed it was temporary. *Id.* NP Bilak placed him on feed-in status for another 30 days until he returned to see the gastroenterologist. *Id.*

On September 19, 2016, Plaintiff refused to be cuffed for a consult with Dr. Agrawal at Hagerstown, Maryland, stating that he could not place his left hand over the right with the three-piece cuffing due to the colostomy site. *Id.* at 28-29. Plaintiff was advised that cuffing was a

4

security issue. *Id.* NP Bilak noted that she would see whether Plaintiff could be seen via telemedicine. *Id.*

On October 22, 2016, Plaintiff reported to the medical unit to request colostomy removal surgery. *Id.* at 29-30. He had no complaints of abdominal discomfort, and the colostomy was functioning without problems. *Id.* Plaintiff was referred to a provider for evaluation and treatment. *Id.*

On November 15, 2016, Plaintiff was seen by Mohammad Saleem, M.D., the onsite surgeon, who noted that Plaintiff's scar had healed well with slight tenderness at the midline and no other abnormality. *Id.* at 31-32. Dr. Saleem noted that the colostomy was temporary. *Id.* Thus, he recommended reversal and placed a consultation request accordingly. *Id.*

On December 19, 2016, Plaintiff had his second follow-up with Dr. Agrawal, who acknowledged that Plaintiff wanted the colostomy reversed. *Id.* at 33. Dr. Agrawal stated that Plaintiff would need a rectal/colon biopsy via rectum sigmoidoscopy to evaluate the nerve ganglion prior to reversal of the colostomy. *Id.* For this, Plaintiff would have to see Dr. Abdi at BSH for a gastroenterology consultation. *Id.*

On January 16, 2017, Plaintiff was seen by NP Bilak. *Id.* at 34. At that time, she requested a gastroenterology appointment via telemedicine and rectal sigmoidoscopy. *Id.* On February 3, 2017, Plaintiff was seen by Dr. Abdi via telemedicine. *Id.* at 36-41. Dr. Abdi agreed that Plaintiff needed a colonoscopy with rectal sigmoidoscopy biopsy of the nerve ganglion of the rectum and colon and to rule out Hirschsprung disease. *Id.* Another option would be an anorectal manometry or surgical full thickness biopsy. *Id.* at 41.

On February 9, 2017, Plaintiff was seen by NP Bilak. *Id.* at 42-44. Plaintiff continued to complain of abdominal pain on the incision line, and he was advised to massage the keloids with

5

vitamin E lotion. *Id.* Plaintiff saw NP Bilak again on March 7, 2017, for a history and physical prior to his appointment with Dr. Abdi. *Id.* at 46-47.

On March 16, 2017, Plaintiff was seen by Dr. Abdi. *Id.* at 45. Plaintiff's colonoscopy was canceled as it had a low chance of evaluating Hirschsprung disease. *Id.* Instead, Dr. Abdi consulted with Dr. Jain, who did not see evidence of Hirschsprung on the surgical pathology. *Id.* Dr. Abdi explained the possibility of a motility disorder and recommended a whole-body motility scan at Johns Hopkins Hospital ("JHH"). *Id.* Dr. Abdi also noted that Plaintiff had no abdominal pain that day, and that he discussed the treatment plan with Dr. Lee, Dr. Ashraf, and Dr. Agrawal. *Id.*

On March 20, 2017, Plaintiff was seen by NP Bilak for a follow-up. *Id.* at 48-49. NP Bilak requested a telemedicine consultation with Dr. Agrawal to clarify Dr. Abdi's recommendations regarding the motility scan. *Id.*

On June 1, 2017, Plaintiff was seen by NP Self (formerly known as NP Bilak). *Id.* at 50-51. Plaintiff asked when his motility study would take place, and NP Self informed him that it had been scheduled for May 17, 2017 but canceled by JHH. *Id.* She informed him that it was being rescheduled. *Id.* On July 5, 2017, NP Self told Plaintiff that his motility study was set for the following month. *Id.* at 52-53. On July 10, 2017, Plaintiff returned to the medical unit for chronic care clinic, at which time he complained of pain along the scar line. *Id.* at 54-56.

On August 2, 2017, Plaintiff was seen by Fariha Ramay, M.D., a gastroenterologist at the University of Maryland Medical System ("UMMS"), for evaluation of a possible colostomy reversal. *Id.* at 57-58. Due to Plaintiff's history of an unprecedented 20-day period of constipation prior to the colostomy, Dr. Ramay opined that Plaintiff may have had an acute colonic pseudo-obstruction but not Hirschsprung disease. *Id.* Dr. Ramay planned to obtain Plaintiff's medical

6

records for review, refer Plaintiff to the UMMS colorectal surgery department for a second opinion, and refer Plaintiff to dermatology for management of the keloid. *Id.*

On August 4, 2017, Plaintiff was seen by Mahboob Ashraf, M.D. at NBCI with complaints of clotted blood at the surgery site. *Id.* at 59-60. The site was cleaned, and Plaintiff was prescribed an antibiotic for one week. *Id.* Dr. Ashraf noted that Plaintiff was receiving Tramadol twice daily for pain. *Id.* Plaintiff returned for a follow-up with Dr. Ashraf on August 9, 2017, at which time Dr. Ashraf requested consults with UMMS colorectal surgery and dermatology as recommended by Dr. Ramay. *Id.* at 61-64. On August 24, 2017, Dr. Ashraf informed Plaintiff that the request for a UMMS surgery consult was approved by Collegial, while the dermatology consult was deferred until after the colostomy was reversed. *Id.* at 65-66.

On October 5, 2017, Plaintiff was seen by Dr. Ashraf at chronic care clinic after being referred by a nurse for a bleeding stoma. *Id.* at 67-69. On examination, no active bleeding was noted, and the stoma was working fine. *Id.* Dr. Ashraf saw Plaintiff again on October 31, 2017, following complaints of pain on the scar line. *Id.* at 71-72. Dr. Ashraf noted that the site was infected, and he prescribed the antibiotic Amoxicillin for 7 days. *Id.* Although Tramadol helped with pain, Plaintiff was advised that his prescription would be tapered off due to the possibility that Tramadol could cause bleeding and seizures. *Id.* On November 5, 2017, Plaintiff's Tramadol dose was tapered down to stop within 28 days. *Id.* at 74-75.

On November 8, 2017, Dr. Ashraf informed Plaintiff that his consult with UMMS was scheduled and would take place soon. *Id.* at 76-77. On November 14, 2017, Plaintiff was transported to JCI in anticipation of his UMMS evaluation the following day. *Id.* at 78. On November 15, 2017, Plaintiff had a follow-up visit with Dr. Ramay, who reviewed records from the June 2016 colostomy and again recommended surgical evaluation of the ostomy reversal at the

UMMS colorectal surgery clinic. *Id.* at 79-80.

On November 21, 2017, Plaintiff saw NP Pierce during chronic care clinic and requested a referral to a physician for pain management. *Id.* at 82. NP Pierce submitted the referral during Plaintiff's next visit, on December 21, 2017. *Id.* at 83-84.

On February 1, 2018, Plaintiff was seen at nurse sick call complaining of pain and requesting Tramadol. *Id.* at 85-86. A referral was submitted for medication evaluation by a provider. *Id.* On February 7, 2018, Plaintiff saw Dr. Ashraf during a sick call visit. *Id.* at 87-88. Plaintiff asked when his surgery would be scheduled, and Dr. Ashraf said it had been approved but he could not locate the approval in the records. *Id.* Dr. Ashraf called the scheduler, who promised that she would find out soon about the UMMS surgery. *Id.* On February 12, 2018, Dr. Ashraf informed Plaintiff that the UMMS appointment was delayed and additional information would be available within two days. *Id.* at 89-91.

On April 3, 2018, Plaintiff was seen by NP Pierce for a scheduled visit. *Id.* at 92- 93. On May 7, 2018, he had a telemedicine appointment with Dr. Getachew, who voiced agreement with the plan to consult Plaintiff's surgeon about a colostomy reversal. *Id.* at 94-95.

On July 22, 2018, Plaintiff had another chronic care visit with NP Pierce. *Id.* at 97-99. He reported that UMMS was unable to complete motility studies; therefore, NP Pierce called the scheduling department to get additional information. *Id.* During a provider visit on September 12, 2018, it was noted that scheduling was waiting for BSH to provide an appointment date for the motility studies. *Id.* Scheduling was asked to secure an appointment at another location. *Id.* On October 2, 2018, Dr. Getachew requested a whole-body motility study at JHH. *Id.* at 102-03.

On December 4, 2018, Plaintiff had motility tests at JHH, which revealed: normal esophageal transit; minimally delayed gastric emptying; normal liquid transit and delayed solid

8

transit; normal small bowel transit; and markedly and diffusely delayed large bowel transit at 24 and 48 hours, although the majority of the radiotracer was excreted by 72 hours. *Id.* at 104-06.

On February 11, 2019, Plaintiff was seen at BSH gastroenterology by Anwar Khokhar, M.D. *Id.* at 107-10. After reviewing Plaintiff's medical records, Dr. Khokhar called Dr. Agrawal, who wanted to go over the motility results again before colostomy reversal "because [Plaintiff] may end up needing surgery again and having a hard time moving his bowel." *Id.* Dr. Khokhar also spoke to the colorectal surgeon, Dr. Bafford, who agreed to see Plaintiff and evaluate whether he was a candidate for reversal. *Id.* Dr. Bafford said that Plaintiff may end up having the ileorectal anastomosis, which could cause diarrhea. *Id.* Tramadol or Neurontin was recommended for Plaintiff's keloid pain. *Id.* Dr. Khokhar also noted that before addressing keloid removal, Plaintiff should be evaluated by the colorectal surgeon, as a reversal may cause another keloid. *Id.*

On March 14, 2019, Plaintiff was seen by Dr. Bafford at UMMS colorectal surgery clinic. *Id.* at 111. Dr. Bafford advised that before reversal surgery, the slow colon transit must be resolved with MR Defecography. *Id.* If there was no obstruction, a completion colectomy (reversal) could be performed. *Id.* Dr. Bafford noted that because Plaintiff was not suffering from constipation at the time, the procedure was elective and not medically necessary. *Id.* On April 10, 2019, Plaintiff was seen at NBCI, at which time a consult for MR Defecography was ordered. *Id.* at 113-14.

On June 8, 2019, Plaintiff was seen at nurse sick call for complaints of abdominal pain. *Id.* at 115-16. On examination, Michael Klepitch, RN did not see any changes in the keloid line. *Id.* Plaintiff indicated that a colostomy reversal should be performed based on the results of his motility study, and Nurse Klepitch explained that the decision on reversal should be left to the specialists and doctors. *Id.* RN Klepitch also explained that the motility study revealed slow transit and therefore, reversal would not be likely on those grounds alone. *Id.*

On September 4, 2019, Plaintiff was taken to the WCI infirmary by correctional officers who stated that he was transported for his offsite appointment, but the MR Defecography was not performed. *Id.* at 117. According to the officers, Plaintiff had not been prepped, thus the procedure was not done. *Id.* Scheduling stated that staff at the facility had called to clear Plaintiff, but the officers had already left by that time. *Id.* The MR Defecography was rescheduled. *Id.*

On October 22, 2019, Plaintiff was again returned by custody without the MR Defecography being done. *Id.* at 119-21. According to the officers, Plaintiff was unable to be placed in the MRI machine because he had bullet fragments in his face, and a CT scan consult was not approved in time. *Id.* A consult for the CT scan was subsequently requested. *Id.*

In his response to Defendants' Motions, Plaintiff claims that he did not tolerate the colostomy procedure well and his pain remained constant thereafter. Response, ECF No. 29. Plaintiff reiterates that the colostomy was intended to be temporary, but Defendants began to use him as a "lab experiment." *Id.* at 4-5. He states that despite medical orders, his appointments were constantly delayed, and he was moved between different facilities. *Id.* at 5. According to Plaintiff, "[t]here is no reason presented that shows why the colostomy reversal has not occurred other than deliberate indifference." *Id.* at 5-6.

### Plaintiff's Motion to Amend

Plaintiff has filed a Motion to Amend seeking to add eight additional defendants. ECF No. 19. Plaintiff alleges that RN Kimberly and RN April deliberately delayed and denied him pain medication, Nurse Director Bill Beaman directed correctional officers to ignore medical orders, and Dr. Agrawal lied to him about the colostomy lasting only four months and causing him permanent nerve damage as a result of the surgery. *Id.* at 1-2. In addition, Plaintiff alleges that correctional officers Glaze, Sollenberger, Keshner, and Bonner restrained him across his abdomen

during transport following the surgery, thus causing severe pain and scarring down the center of his abdomen. *Id.* at 2. Defendants opposed the motion. ECF No. 20.

Pursuant to Federal Rule of Civil Procedure 15(a), "[a] party may amend its pleading once as a matter of course within 21 days after serving it, or if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." F. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." F. R. Civ. P. 15(a)(2).

Rule 15 dictates that "[t]he court should freely give leave when justice so requires." *Id.* "Where the proposed amendment to the complaint appears to be a futility, however, this court has the discretion to deny leave to amend." *Pevia v. Wexford Health Source, Inc.*, Civ. No. ELH-16-3810, 2018 WL 6271048, at *1 (D. Md. Nov. 30, 2018). "Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards." *Id.* (citing *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011) ("[A] district court may deny leave if amending the complaint would be futile—that is, if the proposed amended complaint fails to satisfy the requirements of the federal rules.")).

Plaintiff has not provided enough detail to illuminate the nature of the claim and to allow Defendants to respond. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). He has failed to state enough information, such as dates and circumstances surrounding each incident, to identify the alleged wrongdoing and how they relate to his Complaint. As Plaintiff fails to state a valid claim against each proposed defendant, amendment would be futile. Therefore, his Motion to Amend shall be denied.

11

## Standard of Review

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. Motions styled in this manner implicate the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Hous., LLC v. The City of Salisbury, Maryland*, 672 F. App'x. 220, 222 (4th Cir. 2016) (per curiam). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

Here, Defendants filed a Motion titled "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" and submitted additional materials in support. Plaintiff also filed exhibits in support of his claims. Therefore, Plaintiff was on notice that the Court could treat Defendants' Motion as one for summary judgment and rule on that basis. Accordingly, the Court will review Plaintiff's claims under the Rule 56(a) standard.

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original). The Court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## Discussion

### I. Eighth Amendment Claim

Plaintiff's claims, brought pursuant to 42 U.S.C. § 1983, are based on his Eighth Amendment right to be free from cruel and unusual punishment. To sustain an Eighth Amendment claim for denial of adequate medical care, a plaintiff must demonstrate that the defendant's acts or omissions amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that,

13

objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994). "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson*, 775 F.3d at 178 (citations omitted). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer*, 511 U.S. at 844. "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson*, 775 F.3d at 178. Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citation and internal quotation marks omitted).

Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional

14

circumstances. *Id.* Further, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).

Here, Plaintiff's claims center on Defendants' failure to reverse his colostomy and remove his keloid. Viewing the evidence in the light most favorable to Plaintiff, the Court cannot find that Defendants were deliberately indifferent to Plaintiff's needs. Even assuming that, objectively, Plaintiff was suffering from a serious medical condition, Defendants were not subjectively reckless in treating it. Although Plaintiff believed that the colostomy was intended to be temporary, several medical providers and offsite specialists believed that further testing was necessary to determine whether reversal of the colostomy was recommended. As UMMS colorectal surgeon Dr. Bafford explained, a reversal could lead to ileorectal anastomosis, which could cause diarrhea. Moreover, because Plaintiff was suffering from a slow colon, MR Defecography was necessary before surgery to make sure that there was no obstruction. With regard to the keloid removal, all treating physicians agreed that Plaintiff should be evaluated by the colorectal surgeon first, as a reversal may cause another keloid. In the meantime, Plaintiff was routinely seen and treated by the medical staff to address his complaints of keloid pain.

None of Defendants' actions amounted to an act or omission "for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Plaintiff claims that Defendant Carpenter improperly removed his surgery staples, but nothing in the medical record or Plaintiff's surgery discharge instructions supports this assertion. An Eighth Amendment claim is also not presented where, as here, Plaintiff alleges that Defendants have not provided the exact medical treatment that he desires. As previously indicated, "[d]isagreements between an

15

inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir.1970)). Nor does Plaintiff claim that any delay in receiving surgery exposed him to a serious or significant injury. Dr. Bafford indicated that Plaintiff was not suffering from constipation while awaiting reversal surgery and, therefore, the procedure was considered elective and not medically necessary. *See Brown v. Comm'r of Cecil Cty. Jail*, 501 F. Supp. 1124, 1126 (D. Md. 1980) (delay "does not violate the Eighth Amendment where the seriousness of the injury is not apparent").

In sum, Plaintiff has not shown that Defendants exhibited a callous disregard for his serious medical need. *See Estelle*, 429 U.S. at 105-06. Thus, Defendants are entitled to summary judgment on this claim.

## II. Respondeat Superior

Plaintiff makes no direct allegations against Wexford and Dr. Getachew. Instead, it appears that he seeks to hold these Defendants liable for the actions of their employees. It is well established, however, that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no respondeat superior liability under § 1983). Rather, liability of supervisory officials is "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that

16

posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted). "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (footnote and citations omitted).

Plaintiff has failed to plead or demonstrate sufficient facts showing supervisory indifference to, or tacit authorization of, any misconduct by Wexford's employees. As discussed above, Plaintiff failed to show that his Eighth Amendment rights were violated in connection with his medical care. Accordingly, he has necessarily failed to demonstrate that Wexford or Dr. Getachew authorized or was indifferent to any such violation.

Moreover, Plaintiff's assertions do not demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability. *See id.* ("Generally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse."). In his pleadings, he acknowledges that he was routinely seen by nurses and providers during sick call and chronic care visits, and was referred to outside specialists when necessary. Therefore, Wexford and Dr. Getachew are entitled to summary judgment on this ground as well.

### III. Negligence Claims

To the extent that Plaintiff also brings medical negligence claims, the Court declines to exercise supplemental jurisdiction over them. *See* 28 U.S.C. § 1367(c) (stating that a district court

"may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction."). "When, as here, the federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction." *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)). These claims are dismissed without prejudice.[3]

### IV.    Punitive Damages

Punitive damages are allowed in an action under § 1983 when the defendant's conduct is shown to be "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *See Smith v. Wade*, 461 U.S. 30, 56 (1983). There is no evidence on the face of the Complaint, and Plaintiff has offered none in rebuttal to Defendants' Motion, that the conduct alleged was the result of reckless or callous indifference to his federally protected rights. As such, Plaintiff is not entitled to punitive damages.

### V.    Injunctive Relief

Plaintiff's request for injunctive relief is also denied. A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A party seeking a preliminary injunction bears the burden of demonstrating: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About*

---

[3] To sustain a medical malpractice claim in state court, Plaintiff must adhere to the Maryland Health Care Malpractice Claims Act, Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01, *et seq.*, which requires a Plaintiff to file medical negligence claims with the Health Care Alternative Dispute Resolution Office prior to filing suit when the claim for damages exceeds the jurisdictional amount for the state district courts. *See id.* at § 3-2A-02; *see also Roberts v. Suburban Hosp. Assoc., Inc.*, 73 Md. App. 1, 3 (1987).

*Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Group*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994).

As previously discussed, Plaintiff is already receiving medical treatment, although it may not be the exact treatment he desires. Thus, he has failed to demonstrate the likelihood of success on the merits. Moreover, Plaintiff has not demonstrated that he is likely to suffer irreparable harm or that the balance of equities tips in his favor. Thus, his request for injunctive relief is denied.

## Conclusion

Plaintiff's Motion to Amend and Motion for Immediate Injunction are denied. Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, construed as a motion for summary judgment, is granted.

A separate Order follows.

Dated this 23 day of September, 2020.

FOR THE COURT:

/s/ James K. Bredar
James K. Bredar
Chief Judge